The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this honorable court. The first case for argument this morning is 20-1403 Uniloc v. Apple. Can you help me with pronouncing your name? Is it Coide? It is your honor, that's the correct pronunciation. All right, thank you. Please proceed. May it please the court, Brian Coide of the Etheridge Law Group for Uniloc. I want to start with claim construction. The board erred by construing intercepting as artificially precluding only intended and recipient devices as opposed to precluding all intended recipient devices. Under the broadest reasonable interpretation standard, this construction was not reasonable in light of the specification and prosecution history. Now both the board's construction at appendix 11 and the red brief at page 38 hinge on the argument that intercepting is interchangeable with receiving. Both sides cite to the same phrase in the specification. This is the received or intercepted phrase which is on columns 8 lines 56 to 58 and draw opposite conclusions. Uniloc maintains that the ordinary and customary meaning of intercepting. Here this issue can be resolved in Uniloc's favor by looking at the examiner's own words. In particular, if you look at the examiner interview and this is discussed on blue book 15 citing appendix 840 to 841, the applicant initially proposed in an examiner interview that the network entity is receiving messages that are sent between CQN users and then in response the examiner suggested the applicant further clarify the independent claims involve the network intercepting messages that are associated. So the examiner suggested a replacement of receiving with intercepting and that's what the applicant did do in the amendment. That's at page 833 of the appendix. The applicant noted in interview that according to the examiner such an amendment would overcome the prior art of record. This was not merely, your honors, replacing interchangeable terms as applicant tends. Namely, when the examiner stated that a suggested amendment would overcome the prior art, he clearly signaled that intercepting is narrower and distinct from receiving. Well, sir, this is Judge Proust. I take your point, but it does remain the fact, does it not, that the spec seems to use the terms interchangeably. I respectfully disagree, your honor. I mean, there are many, I mean, there are two different meanings, ways you could read an or thing. I mean, or does not always mean things are interchangeable or alternative. You could say, you know, love or war, right? I mean, it could be two different things. It doesn't say, they could, all it's saying is that at that node it could be received or intercepted. It's not trying to equate the two. There's no reading from that portion of the specification and both parties merely cite to that portion of the specification. Again, I think when read in the context of the examiner view, I mean, if they were interchangeable, to address your honors comment, why would the examiner require the change of a word? I mean, this is something, you know, it's not like the examiner was suggesting something to clarify in the context of 112. He was stating that if you make this amendment and then you change receiving with intercepting, then it would overcome the prior art of record. And just as a matter of fairness, you know, this is a situation where this was the term that the examiner suggested and he stated it would overcome the prior art of record. And now we have the same patent office, you know, approximately 10 years later saying that they mean the same. Well, I appreciate that a lot, some of this is a matter of fairness, but some of this is also a matter of notice and notice to the public. So, do you not, you know, kind of appreciate that the public looking at this, I mean, you're, we're under the broadest reasonable interpretation and your interpretation is very much in the context of this and you using that and that and ignoring this because this says more, seems a little problematic in terms of the notice function, does it not? I respectfully disagree, your honor. Again, there, again, the word or does not always mean synonyms, you know, but it's saying here is here are two different alternatives. I would agree that if I were just limited to the received or intercepted quote in the specification that I would have less kind of traction to make the argument, but I think the prosecution history clarifies and that's part of the public record as well. And then with respect to BRI, since your honor has mentioned that, I want to make it clear that we are arguing obviously under BRI. The Apple makes the point that, you know, we cited the Phillips. I mean, our only point there is, you know, drawing a similarity between Phillips and BRI that, you know, both are, have the commonality that they're presumed to have the ordinary and customary meaning. I mean, they use slightly different articulations for the standard. Plain and ordinary is, of course, Phillips. You know, we cite the translogic tech case where claim terms are presumed to have the ordinary and customary meaning. They're very similar and that case was cited by the board. Counselor, this is Judge Reyna. Am I hearing you correctly? Are you saying that the word or cannot link alternatives in the specification? Cannot link alternatives? No, I did not mean to suggest that, your honor. What I was saying was I think or could mean two things. It could mean what they are arguing, interchangeable, that received and intercepted means the same thing and that or could also mean alternatives and that's what we're arguing. So we are arguing alternatives, just to be clear. Okay. Can the word or link synonyms in the claim? It could, your honor. But again, we believe that the prosecution history, you know, again, if you look just at the received or intercepted in the specification, if that was the only guidance, I think you wouldn't have anywhere to go. But the prosecution history, including the examiner's own word, show that he wasn't using, that the received or intercepted was not being interpreted by the examiner and the applicant as synonyms, as interchangeable. They were alternatives. It was, you know, received and intercepted as two different things. You know, as we mentioned in our brief, there could be some overlap, you know. I mean, we use the analogy to, you know, a golf ball where you could say that, you know, someone interceiving the ball first receives it, but that's really, you know, you can look at it that way. We think the best, you know, one analogy we point to in our brief is the technical definition of the wiretapping. Let's go back to your sports analogy. You're saying that one that intercepts the ball does not pass the ball to the intended recipient, right? But is that what the gate controller here in Kalmanik does? It passes it along. Oh, yeah, of course, Your Honor. I mean, our point in focusing on the football analogy was to focus on the intended user. We weren't trying to suggest that, you know, the football analogy applies in every single sense and that, you know, someone intercepting the ball can then pass the ball along. Well, at the end of the day, it seems to me that it detracts from your argument and not from the board's construction. Okay. I understand, Your Honor. That's why I wanted to focus on the McGraw-Hill technical dictionary definition that refers to... This is at Blue Book 11 to 12. You know, this is something where it refers to tapping or tuning into a telephone radio message not intended for the listener. And here, the situation is very similar to a wiretap. The specification at two lines, 61 to 63, describes that the intelligent user clients, and these are the entities making the call, have little to no knowledge of the network. And that is what is meant by something that is intended or unintended. From the perspective of the intelligent user network, they have no knowledge of the, you know, any of the intermediate points or anything going on. The specification talks about policing network services. And then from the perspective of the caller, everything of the network is not intended. So similar, using a wiretap analogy, a criminal suspect making a call doesn't call directly to the FBI. Rather, the FBI would intercept or tap into the call unbeknownst to the suspect. I want to just briefly spend just a few seconds talking about the Kalman Act reference. The main point there is that the board's ruling depended exclusively on Kalman Act. That's at Appendix 22. Then the Apple attempts to justify it under kind of a phantom alternative ground. But as we state in our briefing, that is improper, un-invasive, because there was no alternative ground finding by the board. So then under administrative principles that are invasive, that shouldn't be considered. And with that, I will save the rest of my time for rebuttal. Okay. Thank you. Mr. Presha? Thank you, Your Honors. May it please the Court, my name is Kevin Presha, and I represent the Cross-Town Apple. The board's construction of intercepting was correct, and I'll start there. It was consistent with the structure of the claim, which makes clear that the network device is located between the endpoints of the call. And it's also consistent, as we've been discussing, with the specification, which describes this network policy enforcement entity, the entity that's doing the intercepting. And every time, every time the patent describes this network policy enforcement entity, it describes its function as receiving or intercepting signaling messages. So if you look at Figure 4, for example, which is described in the specification at Column 9, Column 9 is at 109 in the appendix, the specification tells us that Figure 4 illustrates this network policy enforcement entity. And when describing the network policy enforcement entity, again, this is the entity that's doing the intercepting, the patent tells us that it receives signaling messages between two network end devices and passes the messages to the processor for  doing the intercepting, this network policy enforcement entity as receiving the message. So in some ways, you know, we talk about what's interchangeable, whether intercepting and receiving are interchangeable terms. I sort of look at it a little bit different, differently, in the sense that we have to look at how the specification is describing the function of this node, this network policy enforcement entity, and it uses both words to describe the function of this entity. So it was perfectly appropriate for the board to construe it consistent with the broadest reasonable interpretation to include it, to construe it as receiving signaling messages between two endpoints on the device. And we see this again in the abstract. The abstract tells us that the network policy enforcement entity receives messages, associates the message with the known service, and makes the determination. And... Kelser, at the end of the day, it does seem to me to be somewhat illogical that receiving and intercepting are interchangeable. Your Honor, what I would say is receiving is certainly broader than intercepting. I think it's an umbrella term. I think intercepting is a type of receiving, and I think that's what the specification is conveying. And the network policy entity does receiving, and in terms of what intercepting means, intercepting means what you do with it after you receive it, and that's spelled out by the rest of the claim. The rest of the claim tells us that once you receive it, you check the message, you check whether the service is authorized, and if it's authorized, then you forward it through. And this goes back, I think, to the prosecution history, Your Honor, because this word intercepting is not something that had any special meaning to the patent owner. How does that play with the meaning of recipient and interceptor? If you looked at it from that perspective, do you arrive at the same conclusions? Yes, sir, and that's because the interceptor, the one receiving it, as the board properly construed the term, is an entity that's located between the points of the call. And that was the point of distinction during prosecution, that when the examiner suggested the use of the word intercepting, it was to clarify at page 841 of the appendix, as it was put in the response, that intercepting messages are associated with a call between two end users. That was the point of distinction, that the network policy enforcement entity, if not the end user, but it's an entity sitting between the two end users, and that's what the board's construction conveys. Mr. Brescia, I'm sorry, were you done with that? I was going to ask a question about the cross appeal. This is Judge Bryson. Yes, sir. You're done with what you had to say on the main appeal? Yes, sir, I can move to the cross appeal. Okay, very good. On the procedural point, I take it, and correct me if this is wrong, but that the board's finding that your cross references were insufficient, that problem would have been solved, I take it, had you decided to claim the discussion of Claim 1C in connection with Claim 18D. That was my takeaway. Is that yours, as well? That is correct, Your Honor. All right. Sorry to interrupt. Well, that's all right. That was all I needed to know about that. So let me ask you then about the merits, because the board, of course, not only ruled against you on the procedural point, but also then went on, pages 40 and 41, I think it is, of the opinion and addressed the merit. So turning to the merits, let me ask you whether you see the Kalmanic reference as involving a determination of the proper codec specification based on two signals or just one. And I direct you specifically to the setup and the setup at signals. Yes, sir. It's based on one message. And I think the place to look at this is starting at page 26 of the appendix, which is the final written decision. And in the context of Claim 1, this is where the board, I think, got a little bit twisted, because to start, I guess, with page 40, where Your Honor was, the board found that the determination of what codec is authorized is made by the terminating DTI. But that can't be right. And we know that can't be right, because in the context of Claim 1, the board found the exact opposite. The board found, with respect to Claim 1, that the gate controllers in Kalman Act determined authorization based on codec specification. And that's at page 26 of the appendix. This is when it's reciting the arguments, which it then adopts in full in favor of us. So on page 26, the board says the gate controllers receive the setup message. The setup message includes the coding field with the desired quality of service. And the board further found that on receipt of the setup message, the gate controllers, the gate controllers, not the terminating DTI, but the gate controllers, determine what level of service has been authorized. And then after that... But is that not in response, in the case of the codec specification, to the message in the setup act message in which the terminating DTI advises the gate controller of what its authorization is? I don't know if that actually... It makes the determinate... As I understand it, this is explained in your petition, as I understand it. The first thing that happens is that there is a originating DTI explains that it has, let's say, three possible levels of codec specification. Then the recipient DTI responds, well, we have only one. And then the gate controller makes the determination that that therefore must be the one, because that's the only one on which they agree. Is that not correct? It's only partially correct, Your Honor, in the sense that first... And I think figure six in CalMANAC, which is at 1089, is a good illustration of this. And admittedly, figure six is not specific to codec. It relates to caller ID. But the process flow is still the same. And if we look at figure six, the setup message originates from the DTI. It goes to the originating gate controller. The gate controller checks for authorization. This is what the board found with respect to DTI 26. And once it does that, it sets up a gate setup. And we see that in figure six. That gate setup goes to the edge receiver. That gate setup tells the edge receiver to implement the authorized level of codec, the authorized level of service. The setup message then goes to the DTI. And then the DTI sends a setup to tell the gate controller what the terminating DTI is authorized to receive. Right. So the determination, the ultimate determination of what codec level will be used is made after the setup ACK message is sent. Is that not right? Well, no sir, in the sense that the gate controller has already made the determination that the sender, the caller, is authorized for a certain level of service. That's right. But the determination is not made, is it not? As to what the callee is authorized. That determination, as I understand it, is not made until after the setup ACK message is sent. That is correct. All right. Well, why aren't those two separate messages rather than a single message as is required under Claim 18? Because, Your Honor, the message that we are pointing to is the initial setup message. And that's the key message because the setup message is the one that is intended for the DTI. The setup message has a destination address that goes from the caller to the callee. And in that on receipt of that message, the gate controller intercepts it, checks it for authorization. And if it's approved, it sets up the gate setup and then allows the message to go through. And that's all that's required by the claim. Now, my question though to you, to the extent that that is your argument, it does not seem to me that that's the argument that you made in the petition. Because in the petition, you seem to be relying on the setup ACK message as being the message that makes the ultimate determination. I'm looking at pages 36 and 37 of your petition. Yes, sir. And there are two points to make. First is that, of course, we have to read all of this consistent with in the context of a full claim. And so the discussion of CODAC in the petition actually starts in 1B in 26, I guess more specifically on 27, Your Honor. And in that portion, we describe within the setup message, we describe on 28 that the setup message is received by the gate controller, which then uses that information to set up message. We then go on to describe how in that particular situation, because it was authorized, the gate setup message had the same CODAC information. And in 1C, we then go on to describe what Your Honor just discussed, what happens after the setup message is received and the setup ACK then comes back. And the key here, of course, is that our theory is that the filtering step essentially collapses into the determining step once the gate controller makes the determination that the message is authorized, the service is authorized, and forwards it through. And that's what we show in 1B and 1C. And that's where we think the board got wrong, because the board agreed with us on that point with respect to Call 1 and reached an opposite conclusion with respect to Claim 18, who relied on the same evidence, essentially the same claim language. Let me ask you one more question, if I could. With respect to the issue of whether a single message has to contain the various multiple services that are referenced in Claim 18. Now, as I understand it, the Claim 18 refers to the intercepting, requesting, determining, and filtering steps all being done with respect to a single message, not multiple messages. Isn't that correct? I agree with that, sir. Yes. Right. And the message that's filtered in Step 4 is the same single message that was intercepted in Step 1, right? Correct. All right. So I take it that means that the determination of whether the user is that single message is filtered, and the filtering of that message is done based on the authorizations that have been determined at the determining step, right? That's correct, sir. Yes. Okay. Just pointing to the setup message for that. Yes. Right. So if Callmanic provides the caller ID authorization, it's determined in response to one message, and the code specification is determined in response to a different message, I understand you don't necessarily agree with that, but if that's the case, then the method used in Callmanic differs from the method used in Claim 18. Isn't that correct? In that sense, yes, it would. And I see I'm moving into my rebuttal time, so unless Judge Bryce, you have any additional questions, I'd like to reserve my time. No, I don't. Okay. Thank you. We'll reserve two minutes of rebuttal if we need it on the cross-appeal. Mr. Coyde. Your Honor. Sure. Thank you. This is Brian Coyde. Just briefly, Your Honor, on the appeal, I heard counsel say that-now say that receiving is broader than intercepting. That is a change in the position of what they were taking in their briefs. They said consistently, both below and here, that they're interchangeable. It seems to be somewhat of a concession. He's doing a slightly different tweak on what we acknowledge, but we agree with the comment of Judge Reyna in that the term receiving is a very common term. It's in a number of these telecommunication-type claims. Intercepting is not. And so they do have a different meaning. We disagree what that meaning is. We don't think it's the concept of-the intermediary concept that Apple is now proposing. And the reason why it's not, if I could turn Your Honor's attention to the interview summary, which is that Appendix 840. The original language at the bottom of the page is the comment was receiving and filtering messages that are sent between two end users. So the intermediate concept was already there. And then what the examiner proposed, which is on the top of page 841, is the word intercepting messages-a network intercepting messages that are associated with a call between two end users. So between two end users is already in the applicant's initial proposed amendment. What the examiner was doing here was interjecting the notion of replacing the word receiving with intercepting. And when you look at what the board construed this intercepting as, their construction is a network entity receives the message and the network entity is not intended to be supported by the prosecutor. It doesn't make any sense. Why would the examiner, you know, suggest a replacement of the word receiving to intercepting if then the real meaning of it was just receiving all along? I mean, again, this is not the context of something where he's just saying, I want to clarify for 112 because I think you have a 112 issue. They were saying, the examiner was saying, if you change this word, receiving to intercepting, it's going to overcome the prior art. And that's what the applicant did. Can I ask you to turn to the cross appeal? This is Judge Bryson. I have some questions on that. Are you done with the discussion of the appeal? I think so, your honor. Yes. Yeah. Okay. So setting aside the procedural problem, that is the cross reference issue that we talked about earlier. What is the, what is the answer in your view to Mr. Prush's argument about the single signal being sufficient or being shown by CalMedic to establish the codex specification? Well, I don't want to repeat our briefs and I think it's in there, but your brief didn't really discuss this in much detail. So basically what your brief said was that the board got it right. So I'm interested in hearing what your response is to what Mr. Prush has to say today and what is in his red brief and reply brief about the single signal issue. Sure. I understand what Mr. Prush was saying today. It's kind of, you know, somewhat of an apples and oranges approach and that he's picking a signal from one part and then, you know, combining it from another part. So it just seems logically inconsistent as he's applying it. You know, I think it's also, I know your honor, this question was directed to the procedural part, but just hearing Mr. Prush's argument is related to the procedural point in that, you know, the complexity to understand it is flawed by, you know, kind of the simple recitation and how they kind of try to incorporate everything. And the fact that they had to kind of expand, you know, their simple reference to C mapping for claim 1E into six pages of reply kind of makes our point that the mapping was insufficient. Well, let's assume that if they had put in a reference to 1C in the 18E, I guess it is, that that would have done the trick. Let's assume that there are no further problems with the procedural point. But what's wrong with the argument that claim 18 would be satisfied with respects to the caller's authorization, not the callee authorization, but the caller's authorization on a one-signal basis? Do you understand the question? That's a shorthand way of putting it, but you understand the caller versus callee authorization issue that... I'm not sure if I fully follow your honor's question, your honor. Well, in other words, the red brief says, look, it's not necessary to have the callee authorization. All that's necessary is to have the caller's authorization in order to satisfy claim 18. And Kalmanic, they say, shows that. What's wrong with that argument? I think, your honor, our response is that both are required, that it's not, you know, one or the other. Well, is there a reason that you think that's right? Looking at the language of claim 18, what is the basis for making that argument based on the language of claim 18? Your honor, I'm sorry, I don't have a response right now at this moment, but... All right. Yeah. Okay, thanks. Anything further, Judge Breisa or Judge Reina? No, no, no. Okay. Mr. Prussia, two minutes to rebuttal. Thank you, Judge Post. Briefly, just on the procedural point, your honors, I think it's important to note that the patent owner never complained about any of this below. The patent owner did not move to strike our reply. The the record with our reply. And there's a reason for that. And that's because the theory was disclosed. And if we look at appendix 157, this is with respect to claim one, and specifically the filtering limitation of claim one. What we disclosed at the very first sentence of that section of the petition is that the 552 patent describes several different filtering actions that may be performed, including forwarding the message on unaltered. And that is a direct quote, or rather the basis for that is in from column seven from the... Where are you reading from, Mr. Prussia? I'm sorry, I didn't catch your reference. Where are you reading from? Yes, Judge Breisa. It's 157 of the appendix, page 39 of the petition. And we're describing the theory here. And the theory is that the filtering limitation is met once the message has been determined to be authorized and has been forwarded on unaltered. And that comes directly out of the 552 patent. And the basis for that is column 16, 112 of the appendix. So the 552 patent, column 16, line 18. This is where the 552 patent spells out its filtering rules and actions. And the number one filtering rule is forwarding the message on unaltered to the next hop in the path to the intended recipient. So what that means, Your Honor, is that in that scenario, when a message is forwarded on unaltered, everything above, meaning everything above in the claim, all the other limitations, once those limitations are met, all that needs to be shown is forwarding. That's the theory that we disclosed. And sure, I suppose the board, it would have been better for us to, I guess, cut and paste or incorporate by reference everything that we said above. But there really is no need to do that. And I think that's reflected by the fact that patent owner itself never complained about our disclosure. Patent owner never said we had no notice of this. And then just one last final point, Your Honor. And again, just to reiterate, the key point here in terms of why the board got this wrong, it's reflected by the fact that in the context of Claim 1, they looked at the setup message and made the determination, or made the finding, I should say, of the gate controllers, made the determination to filter that setup message for codex specifications. If it was enough for Claim 1, it should have been enough for Claim 18. And unless Your Honor has any additional questions, I yield whatever time I have. Colleagues, hearing none, thank you. We thank both sides and the case is submitted. Thank you. Thank you, Your Honor.